**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| VASILIKI MITCHELL, Individually and on Behalf of All Other Persons Similarly Situated, | : : : | | |
| Plaintiff, | : : | Civil Action No.: | 18-879 (RC) |
| v. | : : | Re Document No.: | 12 |
| CRAFTWORKS RESTAURANTS & BREWERIES, INC., d/b/a GORDON BIERSCH BREWERY RESTAURANT, | : : : : : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

**Granting in Part Defendant's Motion to Compel Arbitration and Dismiss Complaint**

## I. INTRODUCTION

Plaintiff Vasiliki Mitchell has filed a collective action complaint against her former employer, Defendant Craftworks Restaurants & Breweries Group, Inc., alleging that Craftworks violated the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19, and District of Columbia Minimum Wage Revision Act ("D.C. Minimum Wage Act"), D.C. Code §§ 32–1001 to 32–1015. But Craftworks contends that Ms. Mitchell signed an agreement to arbitrate claims of this nature, and it has therefore responded to her complaint by filing a motion under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, to compel arbitration and dismiss the complaint. Ms. Mitchell opposes the motion, raising a number of challenges to the validity and enforceability of the purported Arbitration Agreement.

For the reasons provided below, the Court finds that Craftworks has met its burden of proving formation of the Arbitration Agreement and that Ms. Mitchell has failed to establish a genuine dispute as to the validity or enforceability of the Agreement. The Court therefore grants Craftworks's motion in part and stays all proceedings pursuant to § 3 of FAA, 9 U.S.C. § 3. At this juncture, the Court does not, however, enter an order compelling arbitration or dismissing the complaint. As explained below, the Arbitration Agreement includes a forum selection clause that contemplates arbitration taking place outside the District of Columbia, unless the parties "otherwise mutually agree." And under the FAA, the Court does not have the authority to compel arbitration outside the district in which it is located. *See* 9 U.S.C. § 4. Accordingly, the Court orders that Craftworks and Ms. Mitchell confer and advise the Court whether they "mutually agree" to arbitration within the District of Columbia. If they do not so agree, the Court will transfer the case to a court that possesses the authority to compel arbitration in accordance with the forum selection clause in the Arbitration Agreement.

## II. BACKGROUND

From November 2016 to June 2017, Ms. Mitchell was an Assistant Manager at Craftworks's Gordon Biersch Brewery Restaurant in the Navy Yard neighborhood of Southeast Washington, D.C. Compl. ¶ 9, ECF No. 1. She alleges that during that time period, she and other assistant managers regularly worked more than forty hours per workweek but were never paid overtime wages. *Id.* ¶ 20. Seeking an award of those unpaid overtime wages, as well as liquidated and punitive damages, Ms. Mitchell filed a collective action complaint on behalf of herself and all others similarly situated, raising claims under the FLSA and D.C. Minimum Wage Act. *Id.* ¶¶ 40–57.

Instead of filing an answer, Craftworks moved to compel arbitration and dismiss the complaint. Def.'s Mot. to Compel Arbitration and Dismiss Compl. ("Mot. to Compel"), ECF No. 12. In support of this motion, Craftworks submitted a sworn declaration by its Director of Human Resources, Lori Fulmer, in which Ms. Fulmer says that every new Craftworks employee is provided an arbitration agreement at the beginning of their employment, along with other onboarding documents. Decl. of Lori Fulmer in Support of Mot. to Compel ("Fulmer Decl.") ¶ 4, ECF No. 12-2. In the declaration, Ms. Fulmer further states that, "based on [her] personal review of business records . . . Plaintiff Vasiliki Mitchell entered into a written Mutual Arbitration Agreement with CraftWorks." *Id.* ¶¶ 2, 5.

Attached to the declaration is, according to Ms. Fulmer, "[a] true and correct copy of Ms. Mitchell's Arbitration Agreement." *Id.* ¶ 5. The purported Agreement provides that arbitration "shall be the exclusive and binding remedy," to "be used instead of any court action (including jury trial)," for "any disputes that the Company may have against [the signing employee], and any disputes that [the employee] may have against the Company or any of its employees, supervisors, managers or agents, arising out of or relating to [the employee's] employment." *Id.*, Ex. A. Such covered disputes, the Agreement explicitly states, include claims alleging the "violation of any federal, state or local law," and "claims relating to . . . wages, compensation, training, or terms and conditions of employment." *Id.*

The Agreement also contains a delegation provision stating that the arbitrator has "exclusive authority to resolve any dispute relating to the interpretation" or "applicability" of the Agreement. *Id.* There is a class action waiver as well, which provides that "[a]ll claims and disputes subject to this agreement must be brought in each party's individual capacity, and not as a plaintiff, class representative, or class member in any purported class, collective or

representative proceeding." *Id.* And the Agreement includes a forum selection clause, which provides that arbitration of the covered disputes "will be conducted in Denver County, Colorado or Hamilton County, Tennessee, unless otherwise mutually agreed." *Id.* Below all of these provisions, at the bottom of the submitted copy of the Agreement, the "Employee Name" line is filled with "Vasiliki Mitchell." *Id.* The "Employee Signature" line indicates that Ms. Mitchell digitally signed on October 20, 2016 at 10:29 am. *Id.*

In opposing Craftworks's motion, Ms. Mitchell claims to "recall signing certain . . . onboarding documents electronically" but says that she does not remember "signing an authorization to sign documents electronically" and has "no recollection of signing, reading, or negotiating the purported [Arbitration] Agreement." Decl. of Vasiliki Mitchell in Support of Pl's Opp'n to Mot. to Compel ("Mitchell Decl.") ¶¶ 4, 6, ECF No. 15-2. Ms. Mitchell does, however, recall that a "Team Member Handbook" was "in place at all times during [her] employment." *Id.* ¶ 7. This Handbook, a copy of which Ms. Mitchell obtained online and submitted with her memorandum in opposition to Craftworks's motion, provides that Craftworks "retains the sole right to modify, suspend, interpret, or cancel in whole, or in part, any of the published or unpublished company guidelines or practices . . . without advance notice and without having to give justification." Decl. of C. Andrew Head in Support of Pl.'s Opp'n to Mot. to Compel ("Head Decl."), Ex. 2 at 59, ECF No. 15-1. Among the company practices published in the Handbook is Craftworks's "Arbitration Policy," which "reiterates the terms of the Arbitration Agreement" in its entirety. Reply to Pl.'s Opp'n to Mot. to Compel ("Craftworks Reply") at 15, ECF No. 17; *see also* Head Decl., Ex. 2 at 57–58. Viewing these Handbook provisions together, Ms. Mitchell argues, makes Craftworks's promise to arbitrate illusory and

renders the Arbitration Agreement as a whole unenforceable.  Pl.'s Mem. in Opp'n to Mot. to Compel ("Mem. in Opp'n") at 17–24, ECF No. 15.

In its reply to Ms. Mitchell's opposition, Craftworks acknowledges the authenticity of the submitted Handbook, but it contends that the Handbook is irrelevant because the Arbitration Agreement is a "standalone document" that contains no language under which Craftworks retains the right to go back on its promise to arbitrate.  Craftworks Reply at 16.  With its reply, Craftworks also submitted a second declaration from Ms. Fulmer and several online screenshots, which together describe and depict Craftworks's electronic signing procedures and the security measures it uses to protect the integrity of those procedures.  *See* Del. of Lori Fulmer in Support of Reply to Pl.'s Opp'n to Mot. to Compel ("Reply Fulmer Decl.") ¶¶ 3–8, Ex. A, ECF No. 17-1.

In her second declaration, Ms. Fulmer states that all of Craftworks's new hires review and digitally sign their onboarding documents through accounts that they create on Craftworks's careers website—accounts that can be accessed only by entering the specific employee's unique personal password.  *Id.* ¶¶ 4–5.  To sign a particular document, a new employee signs into their account, opens the document, and clicks on a white "Digitally Sign" button.  *Id.* ¶ 6.  The employee is then prompted to again enter his or her account's unique password.  *Id.*  After the employee has entered the password, a message appears, stating that:

> Under penalties of perjury, I certify that the information which I have provided is true and correct.  I understand and accept that this electronic consent process shall be treated the same as my written signature on paper.  I also understand that I have been provided with the opportunity to print these forms as an alternative or in addition to this electronic consent process.

*Id.* ¶ 7, Ex. A at 10–11.  Below the message is a red "Digitally Sign" button; when the employee clicks that button, the employee's electronic signature and a date and time stamp are recorded on the document.  *Id.* ¶¶ 6–7.

According to Ms. Fulmer, Ms. Mitchell's personnel records indicate that, on October 20, 2016 between 10 am and 12:05 pm, she digitally signed six different documents using this procedure, including the Arbitration Agreement. *Id.* ¶ 9. "[T]rue and correct" copies of these documents are attached to Ms. Fulmer's second declaration. *Id.* ¶ 9, Exs. B–F. Craftworks argues that the digitally signed Arbitration Agreement and these other personnel documents, when viewed in light of the online security procedures employed, prove that Ms. Mitchell agreed to sign the onboarding documents electronically and assented to the terms of the Arbitration Agreement. Craftworks thus asks this Court to enforce the Agreement's terms and dismiss the complaint so arbitration can take place, or at least stay all proceedings until arbitration has occurred. Def.'s Mem. in Support of Mot. to Compel at 12–13, ECF No. 12-1.

## III. ANALYSIS

The FAA reflects "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). By providing that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon any grounds as exist at law or in equity," 9 U.S.C. § 2, the Act "places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms," *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citation omitted). In furtherance of this policy favoring arbitration agreements, § 3 of the FAA provides that "a party may apply to a federal court for a stay of the trial of an action 'upon any issue referable to arbitration'" under a written arbitration agreement. *Rent -A Center*, 561 U.S. at 68 (quoting 9 U.S.C. § 3). "[U]pon being satisfied that the issue[s] involved in [the] suit" are indeed covered by such an agreement, the court is statutorily required to issue the requested stay. *See* 9 U.S.C. § 3. FAA § 4 then goes one step

further: it states that "a party 'aggrieved' by the failure of another party 'to arbitrate under a written agreement for arbitration' may petition a federal court 'for an order directing that such arbitration proceed in the manner provided for in such agreement.'" *Rent-A-Center*, 561 U.S. at 68 (quoting 9 U.S.C. § 4). Similar to § 3, § 4 requires the court to issue such an order "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue." 9 U.S.C. § 4.

Because arbitration is a matter of contract, however, "parties cannot be compelled to arbitrate their disputes unless they have agreed to do so." *Fox v. Computer World Servs. Corp.*, 920 F. Supp. 2d 90, 97 (D.D.C. 2013) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943–44 (1985)). The Supreme Court has thus recognized an "exception" to the liberal federal policy favoring arbitration: courts, not arbitrators, decide "gateway . . . question[s] of arbitrability" unless "the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). A prime example of such a gateway question is the issue that Ms. Mitchell and Craftworks have asked the Court to answer here: whether, under applicable state law, the parties are even bound by an arbitration agreement to begin with.[1] *See id.* at 84; *First Options of Chi.*, 514 U.S. at 944.

---

[1] For what it is worth, one could argue that Ms. Mitchell and Craftworks have "clearly and unmistakably provided" that the arbitrator would decide this gateway dispute. *Howsam*, 537 U.S. at 83. The submitted Arbitration Agreement's delegation provision states that "the arbitrator shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this agreement including, but not limited to, any claim that all or any parts of this agreement is void or voidable." Fulmer Decl., Ex. A (emphasis added). The Supreme Court has held that a delegation provision of this kind, under which the parties agree to arbitrate particular gateway questions, "is simply an additional, antecedent [arbitration] agreement . . . , and the FAA operates on this additional arbitration agreement just as it does any other." *Rent-A-Center*, 561 U.S. at 70. Thus, unless the non-moving party challenges the delegation provision specifically, courts "must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the [arbitration] [a]greement as a whole for the arbitrator." *Id.* at 72; *see also Sakyi v. Estée Lauder Cos., Inc.*, 308 F. Supp.

When considering a motion to compel arbitration under the FAA, the Court applies the summary judgment standard provided in Federal Rule of Civil Procedure 56(a). *See Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008). The question, then, is whether "no genuine dispute as to any material fact" exists regarding the existence of the arbitration agreement and the movant is entitled to enforcement of the agreement as a matter of law. *See* Fed. R. Civ. P. 56(a). "Under this standard, the party seeking to compel arbitration must first present 'evidence sufficient to demonstrate an enforceable agreement to arbitrate.'" *Fox*, 920 F. Supp. 2d at 96 (quoting *Hill v. Wackenhut Servs. Int'l*, 865 F. Supp. 2d 84, 89 (D.D.C. 2012)). "The burden then shifts to [the nonmoving party] to raise a genuine issue of material fact as to the [formation] of the agreement," or the enforceability of the agreement, "using evidence comparable to that identified in" Rule 56. *Id.* (first alternation in original) (quoting *Hill,* 865 F. Supp. 2d at 89).

In examining the evidence, the Court must "draw reasonable factual inferences in the light most favorable to . . . the nonmovant." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015). But this obligation "only attaches 'if there is a "genuine" dispute as to those facts.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007). And "[a] dispute is 'genuine' only if a reasonable fact-finder could find for the non-moving party." *Fox*, 920 F. Supp. 2d at 96. In other words, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion." *Scott*, 550 U.S. at 380. The nonmoving party "must do

---

3d 366, 379 n.5 (D.D.C. 2018). Here, however, the Court need not consider whether the delegation provision in the Craftworks Arbitration Agreement covers this particular gateway dispute, because Craftworks makes no such argument. Instead, Craftworks has expressly requested that the Court determine whether there is a valid and enforceable agreement to arbitrate between the parties. *See, e.g.*, Def.'s Mem. in Support of Mot. to Compel at 7; Reply at 12, 14.

more than simply show that there is some metaphysical doubt as to" the formation or enforceability of the agreement. *Id.*

For the reasons provided below, the Court concludes that Ms. Mitchell has not met this burden here. She makes a number of arguments, most of which challenge either (1) the formation of the Agreement in the first place, or (2) the enforceability of the Agreement's terms, but the Court finds none of them persuasive. The Court therefore grants Craftworks's motion in part and stays the proceedings.

## A. The Formation of the Arbitration Agreement

As noted above, when a party moves to compel arbitration under the FAA, that moving party bears the initial burden of presenting evidence sufficient to demonstrate the formation of an agreement to arbitrate under applicable state law, which the parties here agree is D.C. law.[2] *See Fox*, 920 F. Supp. 2d at 96 (quoting *Hill*, 865 F. Supp. 2d at 89). To meet this burden, Craftworks originally submitted a declaration by its Director of Human Resources, Ms. Fulmer, which states that, "based on [Ms. Fulmer's] personal review of business records . . . Plaintiff Vasiliki Mitchell entered into a written Mutual Arbitration Agreement with CraftWorks." Fulmer Decl. ¶¶ 2, 5. Attached to the declaration is what Ms. Fulmer describes as "[a] true and correct copy of Ms. Mitchell's Arbitration Agreement, *id.* ¶ 5, reflecting that Ms. Mitchell had digitally signed on October 20, 2016 at 10:29 am, *id.*, Ex. A.

After Ms. Mitchell responded by claiming that she remembers neither "signing . . . the purported [Arbitration] Agreement" nor "signing an authorization to sign documents

---

[2] Ms. Mitchell suggests that Maryland law could apply, but she also acknowledges that the Court does not have to decide between Maryland and D.C. "because the same contract principles apply under the law of both jurisdictions." *Watson v. Gold N Diamonds, Inc.*, 736 F. Supp. 2d 266, 269 (D.D.C. 2010); Mem. in Opp'n at 11.

electronically," Mitchell Decl. ¶¶ 4, 6, Craftworks submitted additional evidence with its reply to Ms. Mitchell's memorandum in opposition. This evidence includes a second declaration from Ms. Fulmer and online screenshots that depict Craftworks's digital signing procedures. *See* Reply Fulmer Decl. ¶¶ 3–8. It also includes five other onboarding documents that Ms. Mitchell appears to have digitally signed in succession on the morning of October 20—the same morning that she purportedly signed the Arbitration Agreement. *See id.*, Exs. B–F. Ms. Fulmer's second declaration states that these documents were obtained from Ms. Mitchell's personnel records at Craftworks, "which are kept electronically on a secure server" and were accessed through use of Ms. Fulmer's "unique password." *Id.* ¶ 9.

Ms. Mitchell argues that the Court should not consider any of this new evidence that Craftworks presented with its reply and that Craftworks's initial evidence is insufficient by itself to establish the formation of an agreement to arbitrate. Mem. in Opp'n at 11–15, 29. In support of the latter contention, she points to the District of Columbia Uniform Electronic Transactions Act ("DCUETA"), D.C. Code §§ 28-4901 to 28-4918, which permits parties to conduct transactions by electronic means only if they agree to do so. *See id.* § 28-4904(b). And according to Ms. Mitchell, she does not "recall signing an authorization to sign documents electronically." Mitchell Decl. ¶ 4.

Importantly, however, the DCUETA does not require that the parties *explicitly* agree to conduct electronic transactions. Instead, the statute provides that "[w]hether the parties [have] agree[d] to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct." D.C. Code § 28-4904(b); *see also id.* § 28-4908(b) ("The effect of an electronic record or electronic signature attributed to a person . . . is determined from the context and surrounding circumstances at the time of its creation,

execution, or adoption, including the parties' agreement, if any, and otherwise provided by law."). Thus, that Ms. Mitchell never signed an express authorization to conduct electronic transactions is immaterial. The Court may infer that she agreed to electronically sign documents based on context.

Given Ms. Mitchell's actions here and the surrounding circumstances, the Court is able to make such an inference. Indeed, the Court does not even need to consider Craftworks's reply evidence to conclude that Ms. Mitchell agreed to conduct this transaction by electronic means and that she electronically signed the Arbitration Agreement. As noted above, the Court has a sworn declaration from Craftworks's Director of Human Resources stating that every new employee is provided an arbitration agreement and that the company's business records indicate Ms. Mitchell electronically signed the Arbitration Agreement on October 20, 2016, which was around the time her employment began. Fulmer Decl. ¶¶ 2, 4–5. The attached copy of the Agreement likewise indicates that Ms. Mitchell electronically signed on October 20. *Id.*, Ex. A. Ms. Fulmer's declaration admittedly does not describe Craftworks's digital signing procedures, but it does say that she "ha[s] personal knowledge of the matters contained in this declaration" and "ha[s] knowledge based on [her] personal review of business records made at or near the time by someone with knowledge." *Id.* ¶ 2.

The submitted Arbitration Agreement containing Ms. Mitchell's electronic signature is also a one-page, standalone document, which greatly reduces the risk that she could have electronically signed unwittingly. If the Court was presented with an agreement to arbitrate that was one inconspicuous provision of an extended form contract, the Court's view might be different, particularly because the DCUETA cautions that "[a] party that agrees to conduct a transaction by electronic means may refuse to conduct other transactions by electronic means."

D.C. Code § 28-4904(c). This case does not present that concern, though, and given the simplicity of the Arbitration Agreement, the Court thinks that Ms. Mitchell's electronic signature, in and of itself, shows that she consented to conduct this particular transaction electronically. Thus, Craftworks's evidence, while not exhaustive, is alone sufficient to demonstrate the formation of an agreement to arbitrate and shift the burden to Ms. Mitchell. *See Hill*, 865 F. Supp. 2d at 88, 91 (noting that moving party's initial evidence, which included only an unsigned standard-form employment agreement containing an arbitration clause, "may well have sufficed" to shift burden to nonmovant, before proceeding to consider reply evidence, which "easily" met burden).

Turning to Ms. Mitchell's evidence, it does little to challenge the idea that she agreed to conduct this transaction by electronic means and that she electronically signed the Arbitration Agreement. She states that she does not remember *signing* an authorization to sign documents electronically, Mitchell Decl. ¶ 4, but as explained above, an express agreement to conduct transactions electronically is not necessary under the DCUETA. She also acknowledges that, in October and early November 2016, she signed "many 'onboarding' forms in order to initiate [her] employment," and that she signed "certain of these onboarding documents electronically." *Id.* ¶¶ 3–4. Instead of creating doubt, this admission only lends further support to the Court's initial conclusion that Ms. Mitchell agreed to conduct the transaction by electronic means.

Critically, Ms. Mitchell does not outright deny that she electronically signed the Arbitration Agreement either; she merely states that she has "no recollection of signing, reading, or negotiating" it. *See id.* ¶ 6. Given the evidence that Craftworks submitted, this qualified denial is not enough to create a genuine dispute regarding her assent to the Agreement. Rather, to defeat Craftworks's motion, Ms. Mitchell "must make an unequivocal denial that an

arbitration agreement exists—and must also show sufficient facts in support." *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 564 (4th Cir. 2015). She has done neither.

Furthermore, even if Craftworks's initial evidence was not enough to show that an agreement was formed, it would be within the Court's discretion to consider the evidence that Craftworks submitted it with its reply. *See Taylor v. District of Columbia*, 325 F. Supp. 3d. 144, 145 (D.D.C. 2018); *Hill*, 865 F. Supp. 2d at 91. Though a degree of unfairness is inevitable whenever new evidence is presented in a reply, such unfairness can be mitigated by allowing the opposing party the opportunity to file a sur-reply. *See, e.g.*, *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003); *Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1172 (9th Cir. 2018). Indeed, "district court[s] routinely grant[] such motions when a party is 'unable to contest matters presented . . . for the first time' in the last scheduled pleading." *Ben-Kotel*, 319 F.3d at 536 (quoting *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001)). Here, however, Ms. Mitchell never moved for leave to file a sur-reply. She therefore cannot argue that she was denied the opportunity to respond to all of Craftworks's evidence.

Factoring in Craftworks's reply submissions, the evidence becomes overwhelming that Ms. Mitchell agreed to conduct transactions electronically. As Ms. Fulmer's second declaration and the accompanying screenshots make clear, Craftworks employs multiple security measures to protect the integrity of its digital signing process. Reply Fulmer Decl. ¶¶ 4–7, Ex. A. It is clear as well that new employees are advised of their ability to sign hard copies of the various documents, and that they are made aware of the legal effect that their digital signatures will have. *Id.* Indeed, before they are permitted to sign each document, the employees must acknowledge that they "understand and accept that this electronic consent process shall be treated the same as [their] written signature[s] on paper." *Id.* And before an electronic signature takes effect, the

employee must click a "Digitally Sign" button two different times and enter their account's password in between.  *Id.*  This procedure is more than sufficient for purposes of the DCUETA, which states that "the efficacy of any security procedure" may be used to show that an electronic signature is attributable to a particular individual.  D.C. Code § 28-4908(a).  In other words, if there were any doubt that Ms. Mitchell agreed to sign her onboarding documents electronically, Ms. Fulmer's second declaration puts it to rest.

The same goes for any doubt about the legitimacy of Ms. Mitchell's digital signature on the Arbitration Agreement specifically.  Ms. Fulmer's second declaration and the attached exhibits show that Ms. Mitchell used the described procedure to electronically sign six different onboarding documents, including the Arbitration Agreement, all in a roughly two-hour span on the morning of October 20, 2016.  Reply Fulmer Decl. ¶¶ 8–9, Ex. B–F.  This evidence of course confirms what Ms. Mitchell herself already admits—that is, that she electronically signed certain documents as part of the onboarding process.  Mitchell Decl. ¶ 4.  Ms. Mitchell's assent to the terms of the other onboarding documents makes it far more difficult for her to dispute her assent to the Arbitration Agreement, which involved the same digital signing procedure.  And again, Ms. Mitchell does not outright deny signing the Arbitration Agreement; she claims only not to remember doing so.  *See id.* ¶ 6.

In sum, then, regardless of whether the Court considers Craftworks's reply evidence, it finds that Craftworks has met its burden of presenting sufficient evidence to demonstrate the formation of an agreement to arbitrate.  Ms. Mitchell, meanwhile, may not remember signing the Arbitration Agreement, but she has not produced any evidence that casts doubt on the Agreement's existence.  Thus, the Court concludes that she has failed to establish a genuine dispute as to the Agreement's formation.

**B. The Enforceability of the Arbitration Agreement**

In addition to challenging the formation of the Arbitration Agreement, Ms. Mitchell also argues that the terms of the Agreement are unenforceable. As alluded to above, this contention focuses on Craftworks's Team Member Handbook, which includes an "Acknowledgement of Receipt" form providing that Craftworks "retains the sole right to modify, suspend, interpret, or cancel in whole, or in part, any of [its] published or unpublished company guidelines or practices . . . without advance notice and without having to give justification." Head Decl., Ex. 2 at 59. Those published practices ostensibly include Craftworks's "Arbitration Policy," which the Handbook describes in terms virtually identical to those used in the Arbitration Agreement that Ms. Mitchell signed. *See id.* at 57–58. According to Ms. Mitchell, this language means that Craftworks retained the ability to unilaterally modify or revoke the terms of the Arbitration Agreement, rendering Craftworks's promise to arbitrate illusory and the Agreement as a whole unenforceable. Mem. in Opp'n at 17–24.

It is of course true that a contract is unenforceable if it lacks consideration. *See, e.g.*, *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1003 (D.C. 2008). A contract, in turn, "lacks consideration when one party's promise is illusory, and a promise is illusory when performance of that promise is optional." *Davis v. Joseph J. Magnolia, Inc.*, 640 F. Supp. 2d 38, 45 (D.D.C. 2009). Here, however, contrary to Ms. Mitchell's assertions, the Handbook does not make Craftworks's obligation to arbitrate optional. Indeed, the Handbook does not impact the terms of the executed Arbitration Agreement at all.

For one, the Handbook itself states that its "contents . . . and any verbal statements of management do not constitute an express or implied contract of employment." Head Decl., Ex. 2 at 59. This kind of language is sufficient to disclaim any implied contractual rights under

District of Columbia law.  *See Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 806 (D.C. 2003); *Turner v. Fed. Express Corp.*, 539 F. Supp. 2d 404, 410–11 (D.D.C. 2008).  And in any event, there is no evidence that Ms. Mitchell was asked to sign the Handbook's "Acknowledgement of Receipt" form.  She in fact does not allege in her declaration that she ever even received a copy of the Handbook, and the copy she submitted to the Court is blank.  *See* Mitchell Decl. ¶ 7; Head Decl., Ex. 2 at 59.  To defeat Craftworks's motion, Mitchell need not show conclusively that the Handbook represented a binding contract between her and Craftworks, but to create a genuine dispute, she must provide the Court with more than a blank Handbook that she retrieved online from a public website.  Without more, the Court has no facts on which it could base a conclusion that Ms. Mitchell and Craftworks mutually assented to the terms of the Handbook so as to create a binding agreement.  *See, e.g.*, *REO Acquisition Grp. v. Fed. Nat'l Mortg. Ass'n*, 104 F. Supp. 3d 22, 28 (D.D.C. 2015).

The executed Arbitration Agreement, meanwhile, is, on its face, a standalone, enforceable document that does not reference the Handbook.  Ms. Mitchell does not allege that the Agreement was provided to her at the same time that she was presented the Handbook or that Craftworks treated the two documents as interdependent.[3]  The Agreement provides that

---

[3] Ms. Mitchell requests the opportunity for discovery to determine whether the Handbook was presented contemporaneously with the Arbitration Agreement, and in support of this contention, her attorney has submitted a declaration under Federal Rule of Civil Procedure 56(d). *See* Rule 56(d) Decl. of C. Andrew Head in Support of Mem in Opp'n, ECF No. 15-3.  But to be entitled to discovery under Rule 56(d), Ms. Mitchell must demonstrate why she is currently unable to produce on her own the particular facts she seeks to discover. *See, e.g.*, *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26 (D.C. Cir. 2014).  She has not adequately done that here.  Indeed, how the Handbook was presented to her is something that should be, to a large extent, within Ms. Mitchell's own knowledge. *See id.* at 26 (noting that Rule 56(d) requests should be granted when the particular facts at issue are in the "sole possession" of the party moving for summary judgment).  Yet, as explained above, Ms. Mitchell has not alleged in her declaration that she received the Handbook and the Arbitration Agreement contemporaneously. *See* Mitchell Decl. ¶ 7.  In fact, she does not even allege that she received a

Craftworks and Ms. Mitchell "each agree to resolve [the covered] dispute[s] through binding arbitration before an arbitrator experienced in employment law." Fulmer Decl., Ex. A. And nowhere in the Agreement does Craftworks retain the right to modify or revoke its half of this promise. That each party takes on reciprocal obligations is sufficient consideration to make the Agreement an enforceable contract.[4] *See, e.g.*, *Sapiro v. VeriSign*, 310 F. Supp. 2d 208, 214 (D.D.C. 2004) ("Mutual agreements to arbitrate are independently sufficient forms of consideration."). Craftworks's performance under the Agreement therefore is not optional, and its promise is not illusory.

Taking all of this together, the Handbook advises employees of Craftworks's general practices and policies without obligating Craftworks to maintain those practices in the future. But Craftworks's "right to modify, suspend, interpret, or cancel" its policies does not override its preexisting, independent contractual obligations. Thus, though Craftworks may, for instance, suddenly decide to stop presenting its new hires with arbitration agreements, it still must perform under all of the arbitration agreements it has already executed—including the Arbitration Agreement with Ms. Mitchell.

None of the cases that Ms. Mitchell cites changes this calculus, because they all involve circumstances where there was no independent, standalone arbitration agreement. In *Davis*, for example, the arbitration agreement that the employer sought to enforce was contained within the employment handbook, which the employee had signed. 640 F. Supp. 2d at 40. The handbook

---

copy of the Handbook at all; she states solely that the Handbook was "in place," or "in effect," during her employment. *Id.* This allegation simply is not enough to create a *genuine* dispute regarding these facts.

[4] Contrary to Ms. Mitchell's suggestions, it is immaterial that no Craftworks representative signed the Agreement, as "one party's failure to sign an agreement does not invalidate it if the parties' conduct manifests assent to the terms of the contract." *Signature Techs. Sols. v. Incapsulate, LLC*, 58 F. Supp. 3d 72, 81 (D.D.C. 2014).

stated that the arbitration policy was a "legal agreement" and that the employer "agreed to be bound by it," but the handbook also provided elsewhere that "the policies and benefits described . . . are subject to change at the sole discretion of [the employer] at any time." *Id.* at 45. In light of this "conflicting language" contained within one document, the court reasoned that "it [wa]s far from clear that [the employer] lack[ed] the power under the terms of the [handbook] to alter its arbitration policy." *Id.* at 46. Construing that ambiguity against the employer as the drafter of the purported agreement, the court concluded that the employer's performance was optional and that the arbitration agreement was unenforceable. *Id.*

Similarly, *Brent v. Priority 1 Automotive Group, BMV of Rockville*, No. PWG-14-1705, 2016 WL 9724975 (D. Md. Aug. 4, 2016), involved a purported mutual arbitration agreement included within an employee handbook. *See id.* at *1–*2, *8. There, when the employees were provided copies of the handbook, they were also given an "Arbitration Acknowledgment" form, which they were asked to sign and return to the employer. *Id.* at *2. The Acknowledgement form largely restated the "Arbitration Policy" that was included in the handbook, but it did so in unilateral terms from only the employee's perspective; the form did not provide for a reciprocal obligation from the employer. *Id.* at *6. Evidence also showed that the employer treated the Acknowledgement as a companion form to the arbitration-related language in the handbook. *Id.* For these reasons, the court concluded that the Acknowledgement, when taken by itself, lacked consideration and was not enforceable. *Id.* Instead, the court explained, "any agreement to arbitrate necessarily encompassed" the employee handbook. *Id.* at *8. Having made that determination, the court then followed the same path as the court in *Davis*: it looked to the fact that the handbook reserved the employer's unqualified right to change or abolish its policies

without notice and held that such language "resulted in an illusory promise that d[id] not suffice as consideration." *Id.* at *8.

In contrast to *Davis*, *Brent*, and the other cases cited by Ms. Mitchell, there is no evidence here that the parties' Arbitration Agreement somehow encompasses the Handbook. Rather, the Arbitration Agreement is distinct, and it is independently enforceable. The Agreement does not reference the Handbook, and there is no evidence that the two documents were provided to Ms. Mitchell contemporaneously or that Craftworks treated them as being interdependent. Thus, Ms. Mitchell has failed to establish a genuine dispute as to the existence of legally sufficient consideration. Regardless of what the Handbook says, Craftworks is bound by its promise to arbitrate under the Arbitration Agreement, and the Agreement is enforceable.

### C. Craftworks's Litigation Conduct and the Issue of Waiver of Arbitration Rights

Ms. Mitchell makes one other argument as to why the Court should not enforce the Arbitration Agreement—an argument that has thus far gone unmentioned. She contends that Craftworks has waived its right to arbitration by asking this Court to strike her collective action claim and force her to proceed on an individual basis. The permissibility of collective action, Ms. Mitchell says, is an issue delegated to the arbitrator under the delegation provision of the Arbitration Agreement. After Ms. Mitchell made this assertion in her memorandum in opposition to Craftworks's motion, Craftworks reversed course and withdrew its request that the Court strike the collective action claim. *See* Craftworks Reply at 14 ("Pursuant to the clear and unmistakable intentions of both Craftworks and Plaintiff, all other disputes—including the validity of the class action waiver—must be delegated to the arbitrator.")

The parties therefore now agree that the Court should make no determination regarding the permissibility of collective action. The Court also agrees. "[T]he question whether an

arbitration agreement permits classwide arbitration is a gateway matter," which as explained above, "is reserved for judicial determination unless the parties clearly and unmistakably provide otherwise." *Sakyi v. Estée Lauder Cos., Inc.*, 308 F. Supp. 3d 366, 380 (D.D.C. 2018) (quoting *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599 (6th Cir. 2013)); *see also Catamaran Corp. v. Towncrest Pharmacy*, 864 F.3d 966, 972 (8th Cir. 2017); *Dell Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 873 (4th Cir. 2016); *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 329 (3d Cir. 2014). Here, the parties have clearly and unmistakably delegated the issue of classwide arbitration to the arbitrator. The Arbitration Agreement includes a provision that specifically addresses the availability of class claims, and the delegation provision states that "the arbitrator shall have the exclusive authority to resolve any dispute relating to the interpretation [and] applicability" of the Agreement. Fulmer Decl., Ex. A. Thus, the question whether the Agreement prohibits Ms. Mitchell from pursuing collective action is for the arbitrator to answer, not the Court.

The only question for the Court is whether Craftworks's error of initially asking for judicial action on class availability constitutes conduct that waives its right to arbitration. The Court has little trouble concluding that no waiver occurred. A party "waive[s] its right to arbitration by acting 'inconsistently with the arbitration right.'" *Khan v. Parsons Global Servs., Ltd.*, 521 F.3d 421, 425 (D.C. Cir. 2008) (quoting *Nat'l Found. for Cancer Research v. A.G. Edwards & Sons, Inc.*, 821 F.2d 772, 774 (D.C. Cir. 1987)). When determining whether a party has so acted, the inquiry is "inherently fact-bound" and involves "few bright-line rules." *Zuckerman Spaeder, LLP v. Auffenberg*, 646 F.3d 919, 922 (D.C. Cir. 2011). Rather, courts look at the "totality of the circumstances." *Id.* (quoting *Nat'l Found. for Cancer Research*, 821 F.2d at 774). They "assess, among other things, whether a party timely sought arbitration; whether

the party now moving for arbitration engaged in litigation activity that induced the other party

and 'the district court to expend time and effort on disputes, the resolution of which would not'

move the dispute toward arbitration; and whether the party opposing arbitration would suffer

prejudice from the movant's delay in seeking arbitration." *Partridge v. Am. Hosp. Mgmt. Co.,*

*LLC*, 289 F. Supp. 3d 1, 17 (D.D.C. 2017) (quoting *Zuckerman Spaeder*, 646 F.3d at 923).

None of these considerations weigh in favor of waiver in this case. Notwithstanding its

initial error regarding class availability, Craftworks still sought to compel arbitration promptly; it

filed its motion to compel in place of filing an answer to Ms. Mitchell's complaint. Though its

erroneous request for relief may have caused Ms. Mitchell to expend some time and effort

responding in her memorandum in opposition, any such time and effort was surely minimal.

And given that Craftworks has withdrawn the erroneous request, it has not caused the Court to

devote time and resources to an issue that does move the dispute toward arbitration. In short,

Craftworks did not "substantially invoke[]" the "litigation machinery" before communicating its

"intention to arbitrate." *Partridge*, 289 F. Supp. 3d at 17 (quoting *Cornell & Co. v. Barber &*

*Ross Co.*, 360 F.2d 512, 513 (D.C. Cir. 1966)). Thus, taking into account the totality of the

circumstances, Craftworks has not waived its right to arbitration, and, for the reasons provided

above, it is entitled to enforcement of the Arbitration Agreement.

### D. The Court's Authority to Compel Arbitration Outside of the District of Columbia

Having concluded that an enforceable agreement to arbitrate exists, the Court is required

under § 3 of the FAA to stay all proceedings related to Ms. Mitchell's lawsuit until arbitration

has completed. *See* 9 U.S.C. § 3. Under § 4 of the FAA, the Court also has the general authority

to issue "an order directing the parties to proceed to arbitration in accordance with the terms of

the" Arbitration Agreement. *Id.* § 4. But § 4 includes an important limitation on that authority:

it provides that the resulting arbitration proceedings "shall be within the district in which the petition for an order directing such arbitration [wa]s filed." 9 U.S.C. § 4. Here, this limitation is relevant because the Arbitration Agreement between Craftworks and Ms. Mitchell contemplates arbitration taking place outside the District of Columbia. The Agreement states that "arbitration will be conducted in Denver County, Colorado or Hamilton County, Tennessee, unless otherwise mutually agreed." Fulmer Decl., Ex. A.

In other words, if the Court were to enforce the Arbitration Agreement by its terms and order arbitration in one of the designated forums, the Court would potentially exceed its statutory authority. The D.C. Circuit has not yet confirmed this concern, but multiple other courts of appeals have, holding that "where parties [have] agreed to arbitrate in a particular forum only a district court in that forum has authority to compel arbitration under § 4." *Ansari v. Qwest Commc'ns Corp.*, 414 F.3d 1214, 1219–20 (10th Cir. 2005); *see also Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1018 (6th Cir. 2003); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 327 (7th Cir. 1995). The Court agrees that this is the correct interpretation. The relevant part of § 4 uses mandatory language, and any other construction renders that language meaningless.[5] *See Ansari*, 414 F.3d at 1220.

---

[5] Courts have adopted two other approaches when deciding whether courts may order arbitration in another district, but this Court opts to follow neither of them here. First, the Fifth Circuit has held that a district court may compel arbitration in the district designated by the arbitration agreement, even if that district is outside of the court's jurisdiction. *Dupuy-Busching Gen. Agency, Inc. v. Ambassador Ins. Co.*, 524 F.2d 1275, 1276, 1278 (5th Cir. 1975). Simply put, this view cannot be reconciled with the clear text of § 4. Second, the Ninth Circuit has conversely held that a district court may compel arbitration in its own district, even if the arbitration agreement at issue designates a forum outside of the district. *Textile Unlimited, Inc. v. A..BMH and Co., Inc.*, 240 F.3d 781, 783–86 (9th Cir. 2001). But this conclusion that the FAA "does not require venue in the contractually-designated arbitration locale," *id.* at 783, is difficult to square with the general principle that the "FAA . . . places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms," *Rent-A-Center*, 561 U.S. at 67. In any event, *Textile Unlimited* involved a suit to enjoin

Thus, although the Court has the power to stay this action pursuant to § 3, it lacks the authority under § 4 to compel arbitration in the forums enumerated in the Arbitration Agreement. When confronted with similar circumstances, other courts have transferred the case to a district where venue would be proper and where a court would have the authority to issue an order compelling arbitration consistent with the parties' agreement. *See, e.g.*, *Am. Int'l Specialty Lines Ins. Co. v. A.T. Massey Coal Co.*, 628 F. Supp. 2d 674, 685 (E.D. Va. 2009); *Dempsey v. George S. May Int'l Co.*, 933 F. Supp. 72, 76 (D. Mass. 1996). Indeed, district courts always have the discretion to transfer civil cases to another district "[f]or the convenience of parties and witness," or "in the interest of justice," so long as jurisdiction would be proper. 28 U.S.C. § 1404(a).

Before resorting to transfer, however, the Court notes that the Arbitration Agreement here permits Craftworks and Ms. Mitchell to "mutually agree[]" to an alternative forum. Fulmer Decl., Ex. A. And Craftworks has already indicated that it "is agreeable to arbitration within [the District of Columbia] if [Ms. Mitchell] likewise agrees." Craftworks Reply at 17. Accordingly, in addition to entering a stay pursuant to FAA § 3, the Court orders the parties to confer and, within two weeks, advise the Court as to whether they agree to arbitrate their disputes within the District of Columbia. If they do so agree, the Court will enter an appropriate order under FAA § 4. If they do not, the Court will transfer the case under 28 U.S.C. § 1404(a).

## IV. CONCLUSION

For the foregoing reasons, Craftworks's Motion to Compel Arbitration and Dismiss Complaint is **GRANTED IN PART**. Proceedings are stayed, but the case is not dismissed. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

---

an arbitration rather than a motion to compel arbitration, *see* 240 F.3d at 783, which is arguably a meaningful distinction for purposes of § 4.

Dated:  October 25, 2018                          RUDOLPH CONTRERAS
                                                  United States District Judge